FIRST NAT. BANK OF PHILADELPHIA v. ABBOTT.

(Circuit Court of Appeals, Eighth Circuit. November 24, 1908.)

No. 2,776.

1. BANKRUPTCY (§§ 449, 468, 225*)— PRACTICE IN TAKING TESTIMONY BEFORE REFEREE AND DISTRICT COURT—REJECTED EVIDENCE SHOULD BE TAKEN AND PRESERVED.

A proceeding in bankruptcy is a proceeding in equity, and the taking of testimony therein and the review by appeals of hearings therein are

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

governed by the same practice as they are in suits in equity, except where otherwise specified.

A referee or the District Court taking testimony in a controversy or hearing in bankruptcy is required by that practice to take, record, and, in case of an appeal, to return to the appellate court, all the evidence offered by either party to the controversy, that which is held by them to be incompetent, irrelevant, or immaterial as well as that which they deem admissible, to the end that, if the appellate court is of the opinion that evidence rejected should have been received, it may consider it, render a final decree, and conclude the litigation without remanding the suit to procure the excluded evidence.

From the general rule that all evidence offered should be received, the evidence of a privileged witness, privileged evidence, and evidence which clearly and affirmatively appears to be so incompetent, irrelevant, or immaterial that it would be an abuse of the process or power of the court to compel its production or permit its introduction, are excepted.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 915, 930, 384; Dec. Dig. §§ 449, 468, 225.*]

2. BANKRUPTCY (§§ 463. 228*)—APPEAL AND ERROR—RULINGS EXCLUDING EVIDENCE NOT PRESERVED NOT REVIEWABLE ON APPEAL—REMEDY FOR REFUSAL TO PRESERVE.

Rulings of a referee in bankruptcy or of a District Court excluding evidence not taken and returned to the appellate court are not reviewable there.

The remedy for a refusal of a referee to take and preserve such evidence is an application to the District Court, and, failing there, to the Circuit Court of Appeals, for an order that it be taken and preserved.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 926, 387; Dec. Dig. §§ 463, 228.*

Appeal and review in bankruptcy cases, see note to In re Eggert, 43 C. C. A. 9.]

3. BANKRUPTCY (§ 166*)—REASONABLE CAUSE TO BELIEVE NOT PROVED BY MERE TEMPORARY DEFAULT IN PAYMENT.

The temporary failure of a debtor to discharge his obligations promptly when they fall due is not in itself sufficient to prove that a creditor who is aware of such a default has reasonable cause to believe that it was intended to give a preference by means of a transfer which he obtains.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 256; Dec. Dig. § 166.*]

4. BANKRUPTCY (§ 166*)—GROUNDS OF SUSPICION OF INSOLVENCY OR OF INTENT TO PREFER INSUFFICIENT.

Mere grounds of suspicion that a debtor is insolvent, or that it is intended to create a preference by a transfer, are insufficient to establish the fact that the creditor who receives it has reasonable cause to believe that a preference was intended thereby. There must be substantial evidence of reasonable grounds for such a belief.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 256; Dec. Dig. § 166.*]

5. BANKRUPTCY (§ 467*) — PRACTICE — FINDINGS OF REFEREE AND DISTRICT COURT PREVAIL UNLESS CLEARLY ERRONEOUS.

Where the referee and the District Court have considered conflicting evidence and made a finding or decree thereon, that finding is presumptively right, and it should not be reversed unless it clearly appears that they have fallen into some error of law or have made some serious mistake of fact.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 929; Dec. Dig. § 467.*]

6. BANKRUPTCY (§ 166*)—REASONABLE CAUSE TO BELIEVE—EVIDENCE—CON-
CLUSION.

In April, 1905, a corporation of the highest credit, dominated by its president, a man of the best reputation, both recommended by reliable bankers of St. Louis, where they conducted a large mercantile business, stated to a Philadelphia bank that it had assets worth $1,316,841.94 and owed $429,904.48, and borrowed of that bank $100,000, gave it 20 notes of $5,000, each payable in October, 1905, and agreed to keep a balance of $20,000 in the bank. By June 12, 1905, it had drawn out the $100,000, and had persisted in kiting by depositing its checks on a St. Louis bank in the Philadelphia bank from day to day to the amount in the aggregate of $111,000, and simultaneously drawing out the amounts so deposited daily by means of its checks on the Philadelphia bank which it had deposited in a St. Louis bank, until the Philadelphia bank had positively refused to permit the kiting to continue longer. The corporation promised in June to restore its deposit to the $20,000, but failed to do so, and from July 1, 1905, kept less than $10 in its deposit. In October it paid $30,000 of the $100,000 it owed, and failed to pay $70,000 thereof. Its notes and checks went to protest about the middle of October. The bank refused to accept its common stock as security for its claim, and demanded, and, on November 2, 1905, secured an assignment of, some of its open accounts, upon a statement which it made that it was not its habit to notify debtors of such assignments, and it left the accounts with the corporation for collection. The officers and agents of the Philadelphia bank testified that they did not believe that the assignment was intended as a preference or that the debtor was insolvent.

*Held.* The evidence in this case does not so clearly show that the referee and the District Court were mistaken in their finding that the bank had reasonable cause to believe on November 2, 1905, that it was intended to give a preference by the assignment it secured, that their conclusion should be reversed.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 256; Dec. Dig. § 166.*]

(Syllabus by the Court.)

Appeal from the District Court of the United States for the Eastern District of Missouri.

P Taylor Bryan (William Meade Fletcher, Harvey L. Christie, and Byron F. Babbitt, on the brief), for appellant.

Lee W. Grant and B. Schnurmacher (Leo Rassieur, on the brief), for appellee.

Before SANBORN and VAN DEVANTER, Circuit Judges, and AMIDON, District Judge.

SANBORN, Circuit Judge. This is an appeal from a decree of the District Court which affirmed an order of the referee in bankruptcy to the effect that the claim of the First National Bank of Philadelphia against the estate of the Tennent Shoe Company be expunged unless the bank surrendered the security which it had obtained within four months of the filing of the petition in bankruptcy by an assignment of certain accounts owing to the shoe company. This assignment was made on November 2, 1905. On November 8, 1905, the shoe company gave a letter to the bank in which it stated that its assets were of the value of $1,247,881, and that its liabilities amounted to $405,000. The confidential bookkeeper of the shoe com-

pany had testified that the company carried on its books and in its statements as assets items amounting to several hundreds of thousands of dollars which were either worthless or were liabilities, and that the letter of November 8, 1905, with the exception of the signature, was in his handwriting. The appellant specifies as error the fact that the referee sustained objections to queries put to this witness whether or not the statements in that letter were true, and whether or not the fact was ever communicated to any one prior to December, 1905, that these fictitious items were carried among the alleged assets. But the decree below cannot be reversed on account of these rulings, because the facts that the statements in the letter were not true, that the bookkeeper knew that fact, and that the presence of the fictitious assets in the statements was not communicated to the bank, or any of its agents, are sufficiently established by other evidence in the record, and must have been taken as true in the court below, and will be so taken in this court, so that these rulings, if they were erroneous, could not have prejudiced the bank, and also because the questions they present are not reviewable here in the present state of this record.

A proceeding in bankruptcy is a proceeding in equity, and on an appeal to this court, or to the Supreme Court, the decisive issue is not whether there was an error in the admission or exclusion of evidence, but whether or not all the competent and relevant evidence presented to the appellate court sustains the decree. The established practice in the federal courts in equity is that examiners, masters, and the Circuit Courts must, under rule No. 67 in equity, take, record, and, in case of an appeal, return to the appellate court, all the evidence offered by either party, that which was held to be incompetent or immaterial as well as that which they deemed competent and relevant, to the end that, if the appellate court is of the opinion that evidence rejected should have been received, it may consider it, render a final decree, and thus conclude the litigation without remanding the suit to procure the excluded evidence. If evidence is objected to and ruled out, it must nevertheless be written down and preserved in the record subject to the objections, or the ruling cannot be considered in the appellate court. From the general rule that all evidence offered must be taken and preserved, the evidence of a privileged witness, evidence plainly privileged and evidence which clearly and affirmatively appears to be so incompetent, irrelevant, or immaterial that it would be an abuse of the process or power of the court to compel its production or to permit its introduction, are excepted. Blease v. Garlington, 92 U. S. 1, 7, 8, 23 L. Ed. 521; Dowagiac Mfg. Co. v. Lochren, 143 Fed. 211, 213, 214, 74 C. C. A. 341, 343, 344, and cases there cited. Referees, other officers taking testimony, and the District Court are governed by the same rule of practice in the taking of evidence and the hearing of controversies in bankruptcy, where the reason for the rule is much stronger than in ordinary suits in equity, because many of the orders and decrees in bankruptcy are reviewable first in the District Court and again in the Court of Appeals, and the delays would be intolerable if it were necessary for each court to remand for further testimony whenever it found that ex-

cluded evidence should have been received. The bankruptcy act of 1898, c. 541, § 24a, 30 Stat. 553 (U. S. Comp. St. 1901, p. 3431), provides that appeals as in equity cases may be taken in bankruptcy proceedings, and the Supreme Court, in prescribing the method of taking testimony, substantially followed the provisions of rule 67 in equity. General Orders in Bankruptcy No. 22, 89 Fed. x, 32 C. C. A. xxv. The last sentence of this order shows clearly that it was the purpose of that court to assimilate the practice in bankruptcy to that in equity in this respect: to require all evidence fairly offered, admissible, and inadmissible, to be taken and preserved, and to penalize the taking of incompetent, irrelevant, or immaterial evidence with costs. It reads:

"The referee shall note upon the deposition any question objected to, with his decision thereon, and the court shall have power to deal with the costs of incompetent, immaterial or irrelevant depositions; or parts of them, as may be just."

In re De Gottardi (D. C.) 114 Fed. 328, 342; Dressel v. North State Lumber Company (D. C.) 119 Fed. 531; In re Romine (D. C.) 138 Fed. 837, 839. In the case at bar the referee failed to take and preserve the testimony which he excluded, and it is not presented to this court. For that reason his rulings excluding it are not reviewable here. Blease v. Garlington, 92 U. S. 1, 8, 23 L. Ed. 521. The only question judicable on the appeal is, was the decree of the District Court sustained by the competent and relevant evidence which is presented to us in the record before us?

The referee, after noting the objections to the questions, his rulings thereon, and the exceptions thereto, should have taken, written down, and returned the rejected evidence. If he refused or failed to do so upon proper request, the remedy of the party aggrieved was not an appeal, but an application to the District Court, and, failing there, to the United States Circuit Court of Appeals, for an order that such testimony be taken and preserved. When the rejected testimony is made a part of the record and returned to an appellate court, and then only, can such a court consider and decide the legality of the rulings which excluded it, and, after determining that question, it will proceed to decide whether or not all the admissible evidence presented to it sustains the decree below, and to render a final decree accordingly. Fortunately the erroneous practice pursued in the case in hand has in no way prejudiced the cause of the appellant, and the proper practice and the reason for it have been called to the attention of the officers and the members of the profession with some care, that later litigants may not suffer loss by similar errors.

The Tennent Shoe Company was, during all the time here in question, an insolvent corporation which was managed exclusively by its president, a man of the highest reputation for integrity, veracity, piety, and all the other virtues, who, with the exception of his confidential bookkeeper who kept the private ledger, was the only person who knew that among the assets included in the statements to creditors and to commercial agencies put forth by him for his corporation were items which aggregated about $600,000 which were either worthless or of negligible

value. This corporation was conducting a large mercantile business in the city of St. Louis, had a common stock of $500,000, on which it was paying a dividend of 10 per cent. per annum, and a preferred stock of $300,000 on which it was paying a dividend of 7 per cent. per annum, and as late as November 2, 1905, when the bank took the assignment challenged, the preferred stock was quoted above par in the market reports in the city of St. Louis. The corporation was given the highest grade of credit by the mercantile agency of R. G. Dun & Co. The corporation and its president were recommended for credit by reliable bankers and business men of St. Louis, and in June, 1905, and during the last days of October of that year, some of them stated to the assistant cashier of the bank, who went to St. Louis to inquire, that the president was a good man, of the strictest integrity, and that in their opinion the corporation would pay its debts. In April, 1905, the president presented to the First National Bank of Philadelphia recommendations by reliable bankers of St. Louis of the highest character, both of the integrity of the president and of the financial standing of the corporation, together with a statement of the corporation signed by himself that its assets were worth $1,316,841.91, and that its liabilities amounted to $429,901.98, and he asked for a line of discount of $100,000 for his corporation. The bank granted this request, and the corporation agreed to maintain a deposit with the bank of $20,000. Thereupon the corporation made 20 promissory notes of $5,000 each, payable at various dates between October 1 and October 31, 1905, and the bank discounted them. Early in June of that year the deposit of the shoe company was far below the $20,000, and it was engaged in kiting; that is to say, it was depositing in the Philadelphia bank day by day checks on the German Savings Institution of St. Louis for the amount of which its own checks drawn on the Philadelphia bank which had been deposited with the Jefferson Bank of St. Louis were daily presented at the Philadelphia bank for payment. On June 6, 1905, the amount thus deposited and drawn within the 10 days just preceding had reached nearly $75,000, and the bank sent the shoe company a letter to the effect that it could not continue to handle St. Louis funds in that way, that it would charge $1 per thousand on all such funds sent it by the corporation, that the latter's balance was under $5,000, and that it requested it to restore the deposit to $20,000. Between June 6 and June 12, 1905, the shoe company persisted in its course. It deposited St. Louis funds which it simultaneously drew out to the amount of $39,000, and then the Philadelphia bank wrote that as this practice had been persistent and had grown in proportion it would not continue such transactions even for $1 per thousand, and in this way it stopped the practice. At the same time the bank sent its assistant cashier to St. Louis, who arrived there on June 14, and left to return to Philadelphia on June 16, 1905. The president of the shoe company showed him a copy of a trial balance of the corporation of May 1, 1905, which was not materially variant from the statement he had delivered to the bank in April, assured him that the business of the corporation was prosperous, and that the kiting was induced by the statement of the cashier of the bank that it would accept St. Louis funds, and that he had indulged in it to discount bills of his corporation. The account of

the corporation was then overdrawn in the Philadelphia bank, and more checks on the St. Louis bank were in the mail. The president of the corporation gave to the assistant cashier of the bank Eastern exchange for the overdraft, and another promise to restore and maintain the deposit at $20,000. That promise was never fulfilled, and between July 1, 1905, and November 1, 1905, the deposit never rose above $10. On July 25, 1905, the bank in vain again demanded that the promise to restore and maintain the deposit be fulfilled. The 6 notes which first fell due, aggregating $30,000, were paid, the remaining 14, which amounted to $70,000, were not paid, but the corporation sent its checks for them drawn on the German Savings Institution of St. Louis, which the Philadelphia bank forwarded to the Third National Bank of St. Louis and to the National Bank of Commerce of that city for collection, but they were not paid. The first note that remained unpaid matured on October 14, 1905. As the first unpaid checks were protested from day to day the bank telegraphed for an explanation, and the shoe company answered that it was a misunderstanding with its bank, that the check dated the 17th would be paid on the 21st, and that they would arrange to take up all the checks on the 26th of October. The assistant cashier of the bank again appeared in St. Louis on Saturday the 29th of October. On October 30, 1905, he called on the Third National Bank, where its officers informed him that they had presented the checks daily but that they had not been paid; that "they had no question but what they would be"; that the president of the shoe company was a good man, held in the highest·esteem, but a poor financier; that the shoe company had been a customer of their bank for some years, and they had extended to it a line of credit of $200,000, but that they had required it at some previous time to close its account with their bank because it was a continual borrower. The assistant cashier then went to the office of the shoe company, where the president assured him that the reason for the failure to pay the notes at maturity was the yellow fever scare and poor collections, that some investors were about to buy some of his common stock and put in about $100,000 or $200,000, that the notes would soon be paid, and that the business was in excellent condition; and he offered to secure the claim of the Philadelphia bank with his common stock in the corporation. The assistant cashier declined to accept the stock as security, and asked for an assignment of some accounts receivable of the corporation. Later in the day the president of the corporation agreed to make the assignment. The assistant cashier asked for a statement of the financial condition of the corporation, but the president declined to make it at that time, and promised to have one prepared for him after November 1, 1905. It was not delivered to him until after the assignment of the accounts on November 2, 1905. From October 30, 1905, until some days after the assignment was made, the president was reported to be ill, and the assistant cashier was unable to see him, although he repeatedly endeavored to do so. The assistant cashier did not call upon or inquire of the German Savings Institution, upon which the protested checks had been drawn, about their payment, or about its alleged misunderstanding with the shoe company, or about the latter's financial condition, although he remained in the city of St. Louis several days after

October 30, 1905. He and the other officers of the Philadelphia bank testified that they believed the shoe company to be solvent, and that they did not believe that it was intended to give the bank any preference by the assignment. Other facts were established by the evidence, which fills many printed pages, but none that can control the result, which must be deduced from those which have been recited.

Counsel contend that an actual intent of the debtor to create a preference was indispensable to the avoidance of a preference given by it within the four months, and that there was no substantial evidence of such an intention. It is unnecessary in this case to consider or decide whether or not such an intent was requisite, for the evidence is convincing that the shoe company was insolvent, and that under the circumstances surrounding the transaction the inevitable effect of the assignment was a preference, and the law conclusively imputes to the shoe company the intention to bring about the result which necessarily arose from the nature of the act which it performed (Western Tie & Timber Co. v. Brown, 196 U. S. 502, 508, 509, 25 Sup. Ct. 339, 49 L. Ed. 571; Wilson v. City Bank. 17 Wall. 473, 486, 21 L. Ed. 723), so that the only real question in this case is, Did the bank have reasonable cause to believe a preference was intended by the assignment when it received it?

The rules of law invoked by counsel for the claimant that the test of insolvency is the insufficiency of a debtor's assets to discharge his liabilities, and not his inability to pay his debts in the ordinary course of business as they mature (section 1, par. 15, c. 541, 30 Stat. 544 [U. S. Comp. St. 1901, p. 3418]), that the mere temporary failure of a debtor to discharge his obligations promptly as they fall due is insufficient to prove that a creditor who is aware of such a default has reasonable cause to believe that it is intended to give a preference which he then obtains (In re Eggert, 102 Fed. 735, 43 C. C. A. 1; In re Pfaffinger [D. C.] 154 Fed. 523), that mere grounds of suspicion that a debtor is insolvent or that it is intended to create a preference by a transfer are insufficient to establish the fact that the beneficiary who receives it had reasonable cause to believe that a preference was intended thereby, and that there must be proof of reasonable grounds for such a belief (Stucky v. Masonic Savings Bank, 108 U. S. 74, 2 Sup. Ct. 219, 27 L. Ed. 640; Mackel v. Bartlett, 36 Mont. 7, 91 Pac. 1064), are conceded to be sound and to be applicable to the case in hand. But the referee and the District Court found that the bank had reasonable cause to believe that it was intended to give a preference by the assignment, and, when the court and the referee have considered conflicting evidence and have made a finding or decree thereon, it is presumptively right, and it may not be reversed unless it clearly appears that they have fallen into some error of law or have committed some serious mistake of fact in reaching their conclusion. Tilghman v. Proctor, 125 U. S. 136, 8 Sup. Ct. 894, 31 L. Ed. 664; Coder v. Arts, 152 Fed. 943, 946, 82 C. C. A. 91, 94, 15 L. R. A. (N. S.) 372, and cases there cited.

The mere temporary inability of the shoe company to pay its debts as they matured was not the only reason for the bank to believe that a preference was intended by the assignment to it in this case. A corpo-

ration which stated that it was worth more than $1,300,000 in convertible assets, in accounts receivable, and merchandise, and that it owed only about $430,000, borrowed $100,000 in April, and agreed to maintain a deposit of $20,000. In June it had drawn out this $100,000 and more, and was so persistently kiting by depositing in the claimant bank St. Louis funds which it drew out on the same day by means of checks on that bank which it had deposited in another St. Louis bank that it was anxious to pay a charge of $1 on a thousand for the privilege of continuing this practice, and it was prevented from prosecuting it only by the peremptory refusal of the Phiadelphia bank to accepts its checks upon the St. Louis bank for this purpose. Would not these facts give a banker of ordinary prudence reasonable cause to believe that such a corporation could not be solvent, that its statements could not be true, that it could not be that it had a surplus of more than $800,000 of convertible assets and was yet persisting in such a pernicious course and was yet refusing to restore so modest a deposit as the $20,000 it had agreed to maintain? The shoe company violated its agreement to keep up its deposit in June, and it continued in that breach in the teeth of repeated demands ever after. Before the bank took the assignment here in controversy it knew that the shoe company had been persistently kiting, that it had failed to maintain its agreed deposit, that its local bank in St. Louis had refused to pay its checks to the amount of $70,000, that some of them had laid protested for weeks, that the corporation after repeated demands by telegraph, by letter, and in person was unable to pay them, and that the Third National Bank in St. Louis where the shoe company had had a line of discount of $200,000, had compelled it to close its account because it insisted upon a perpetual loan. It is true that the president of the corporation and many estimable gentlemen of St. Louis wrote and said pleasant things to the officers of the Philadelphia bank about the corporation. But the Philadelphia bank knew facts that some of the bankers in St. Louis were probably ignorant of, and in the face of the facts which have been recited this court is unable to bring itself to the conclusion that it clearly appears that the referee or the court below made any serious mistake when they found that the Philadelphia bank had reasonable cause to believe on November 2, 1905, that it was intended to give it, what it actually received on that day by the assignment of the accounts, a preference over other creditors similarly situated, and the decree below is accordingly affirmed; and it is further ordered that the appellant shall have fifteen (15) days from the date when the mandate of this court shall be filed in the court below within which to surrender its preference, and that if said appellant within said fifteen (15) days shall surrender its preference it shall then be allowed to prove its entire claim with like effect as if no preference had been given, and this order shall be embodied in the mandate remitted to the court below.