In re SWEENEY.

(Circuit Court of Appeals, Sixth Circuit. March 22, 1909.)

No. 1,859.

1. BANKRUPTCY (§ 223\*)—REFEREES—COMPENSATION.
    A bankruptcy proceeding may be referred to the referee by a special order, or to him as referee on special issues, his power depending on the order of reference; but there is no authority for converting a referee in bankruptcy into a special master, nor for allowing him compensation as such

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

under Bankr. Amend. Act Feb. 5, 1903, c. 487, § 18, 32 Stat. 800 (U. S. Comp. St. Supp. 1907, p. 1033), declaring that neither the referee nor the trustee shall in any form or guise receive, nor shall the court allow them, any other or further compensation for their services than that expressly authorized by the act.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 888–894; Dec. Dig. § 223.*]

2. BANKRUPTCY (§ 467*)—REFEREE'S FINDINGS—APPROVAL BY COURT—REVIEW.
Where a referee's report and finding in bankruptcy, involving deduction and inferences from conceded facts and from correspondence and evidence, had been concurred in by the trial court, a contrary conclusion would not be arrived at on appeal unless it plainly appeared that the finding or conclusion was based on some error of law or plain mistake of fact.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 929; Dec. Dig. § 467.*]

3. BANKRUPTCY (§ 140*)—SALES—RESCISSION—RIGHT TO RETAKE PROPERTY—EVIDENCE.
Evidence *held* to sustain findings that sellers of merchandise to the bankrupt did not give full credit to a financial statement submitted by the bankrupt before delivery of the goods, but that the sellers delivered the goods with knowledge that the bankrupt was unreliable and in failing circumstances, and were therefore not entitled to rescind the sale after bankruptcy had intervened and recover the property as fraudulently procured.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 219; Dec. Dig. § 140.*]

Appeal from the District Court of the United States for the Middle District of Tennessee.

Grafton Green, for appellant.
Charles C. Trabue, for appellee.

Before LURTON and SEVERENS, Circuit Judges, and KNAPPEN, District Judge.

LURTON, Circuit Judge. On December 13, 1907, E. E. Sweeney became voluntarily a bankrupt, and in due course Chas. C. Trabue was selected as trustee. There came into the possession of the trustee a stock of vehicles, including buggies, surreys, etc. Many of these vehicles had been purchased by the bankrupt, who was a dealer in such articles, carrying on business at Nashville, from a copartnership engaged in the manufacture and sale of vehicles at Cincinnati, doing business under the name and style of Ratterman & Luth. This copartnership filed an intervening petition in the bankruptcy proceeding for the purpose of reclaiming such of the vehicles in the hands of the trustee as had been sold by them to the bankrupt. The ground for rescinding the contract of sale was that the sale had been made upon a credit in consequence of fraudulent representations made by Sweeney as to his solvency. The trustee answered and denied the right of reclamation. Thereupon the court referred the issues to the referee "to hear proof and report upon the matters in controversy." Upon a stipulation as to facts and certain exhibits, including the sworn statement of the bankrupt as to his financial status and certain correspondence, there was a report filed by A. L. Childress, styling himself "special master,"

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

denying the right of rescission. To this exceptions were filed. These were overruled, and the findings of the "special master" sustained, and the petition of the intervener dismissed. From this they have appealed.

The issues presented by the intervention were properly referred by the court to the referee for the purpose of hearing evidence and making a report. The referee was Mr. A. L. Childress, who afterwards filed a report as special master. This was doubtless an inadvertence. There is no authority for converting the referee into a special master. The bankruptcy proceeding may be referred to the referee by a general order, or to him as referee upon special issues, his power depending upon the order of reference. Loveland on Bankruptcy, § 29 (3d Ed.); section 22, Bankr. Act 1898 (Act July 1, 1898, c. 541, 30 Stat. 552 [U. S. Comp. St. 1901, p. 3431]). For the most part the duties of a referee are those of a special master, and we know of no authority for the appointment of a special master to do the proper business of the referee. Nor do we know of any power to allow a referee the compensation of a special master. The fees and compensation of that officer were enlarged by the amendments of the act passed February 5, 1903. Section 40 (U. S. Comp. St. 1901, p. 3436) amended by Act Feb. 5, 1903, c. 487, § 9, 32 Stat. 799 (U. S. Comp. St. Supp. 1907, p. 1029). By section 72, added by that amendatory act, it is provided:

"Neither the referee nor the trustee shall in any form or guise receive, nor shall the court allow them, any other or further compensation for their services than that expressly authorized and prescribed in this act." U. S. Comp. St. Supp. 1907, p. 1033.

In re Mammoth Pine Lumber Company (D. C.) 116 Fed. 731, compensation for investigating and reporting upon liens claimed by the interveners was disallowed. So, also, In re Barker (D. C.) 111 Fed. 501. Both of these cases were before the very stringent provisions limiting their compensation in the act of 1903, set out above. But the parties, as well as the court below, treated this report as the proper report of the referee, under the very correct order making the reference to the referee as such, and we shall do the same.

Coming now to the merits. From a stipulation of facts it appears that the bankrupt had for some years prior to the transactions here involved been a customer of the petitioners. Between November 26, 1906, and April 9, 1907, he made four orders aggregating $3,607.12. The shipments under these orders were made as follows:

| | |
|---|---|
| February 9, 1907 | $1,134 20 |
| March 5, 1907 | 1,295 33 |
| March 13, 1907 | 124 85 |
| May 24, 1907 | 1,052 74 |
| | $3,607 12 |

The vehicles sought to be reclaimed are parts of each of the four shipments. For these orders notes were executed so as to divide each order into several notes maturing at varying dates. Five of these notes maturing between May 5, 1907, and July 5, 1907, aggregating $1,247.15, were paid at maturity. A sixth note, maturing July 20, 1907, was paid partly in money and partly by two small renewal notes, which

were paid at maturity. Another note was renewed and paid. The other notes were renewed, and small payments made from time to time. On December 13, 1907, petitioners held six renewal notes aggregating $1,370.79, on which date Sweeney filed his petition in bankruptcy. From the evidence it appears that Ratterman & Luth were not satisfied of the solvency of Sweeney and held up his orders for consideration. They had therefore received reports from sources not disclosed to the effect that Sweeney's financial condition was unsatisfactory. They then sent an agent to Nashville for the purpose of investigation. Brewer, the agent, reported by letter of January 14, 1907, that he had seen Sweeney and told him of the bad reports. That Sweeney had said, "Some one has been lying on me, as I am now nearer out of debt than since I went into business." That he said his total indebtedness was about $6,000, and that he had on hand a $12,000 stock. Brewer then added significantly:

"By to-morrow morning you will get a complete statement from Mr. Sweeney and his financial standing and just how much he owes; so from the way he is fixing up his repository and painting he does not expect to break this year, anyway, so now it is all left for you to decide after you hear from Mr. Sweeney."

Under date of January 18, 1907, Sweeney wrote Ratterman & Luth, inclosing financial statement and complaining of his delay in shipping goods ordered. From that statement it appeared that his resources aggregated $20,319.01 and his liabilities $8,165.55. This being satisfactory, his orders were filled. It was stipulated that in fact Sweeney was insolvent then and throughout the year 1907, and that his liabilities were then between $15,000 and $20,000, instead of $8,000, as stated. The assets which came into the hands of his trustee, including those sought to be reclaimed by petitioner and the Courtland Company, another manufacturer, aggregated in value about $8,000, while the debts scheduled amount to $22,000.

Sweeney's statement bore date of December 28, 1906. That it exaggerated resources and suppressed the truth as to his liabilities must be conceded. That he was desperately insolvent when he made it, and throughout the year 1907, is evident. The referee, upon the stipulations as to facts and upon the exhibits, which included a large number of letters which passed between Sweeney and petitioners and between petitioners and their representative, Brewer, was of opinion, in substance, that the interveners had lost, by their delay after discovering the unreliability of Sweeney, any right which they originally might have had to rescind.

This conclusion involved deductions and inferences from conceded facts and from the correspondence in evidence, which tended to show the falsity of the bankrupt's financial report and his general unreliability. This report and finding was concurred in by the court below. To justify us in a contrary conclusion, it should plainly appear that the finding or conclusion was based upon some error of law or plain mistake of fact. Conceding, as we may, that the falsity of Sweeney's financial statement made a prima facie case for rescission, we are, nevertheless, of opinion that there is no sufficient ground for reversing the action of the court below. The reasons which incline us to this result

may be shortly stated, though for the most part they appear in or are suggested by the report of the referee.

(1) It is not likely that the interveners gave full credit to the financial statement of Sweeney. They had before that, from sources which they do not disclose, bad reports about him.

(2) Brewer's letter reporting upon Sweeney to a certain extent discounts the bankrupt's financial statement. He reports him as claiming his indebtedness to be about $6,000 and his stock on hand as worth $12,000. The statement received the next day after this confidential report represented his liabilities as $8,000, and that an invoice of stock showed about $15,000. Which was true? There was a difference of 25 per cent. Business men must have taken notice of such a discrepancy. Again, this report flippantly observes "that from the painting and fixing up" of Sweeney's repository "he does not expect to break this year, anyway." This carries with it the idea that there is a chance that the "fate" of one about whom they had had bad reports might be or was likely to be postponed for the year.

(3) Almost at once after getting these goods Sweeney began to ask for extensions of credit, and to make partial payments by means of a system of kiting, aided by petitioners. Thus several times he made payments by means of his own check, and then drew against the appellants to put himself in funds to meet his own check. So importunate did Sweeney become in his requests for extensions, and so unreliable about his assurances that he would promptly meet renewals of paper or paper not yet due if a renewal of past due paper was granted, that in September, 1907, Ratterman & Luth had another investigation made, with the result that his standing and responsibility was reported as "Got to be very bad." This report seems to have been sent on a printed form entitled "Salesman's Investigating Report," and is dated September 5, 1907. It is unsigned. Neither Brewer, who made the report of January 14th, nor the salesman who made that of September 5th, were examined as to the sources of their information or the extent of their investigation. After this information a number of renewals were allowed and some small payments received.

From all the facts we have a strong disposition to accept the conclusion of the referee and the court below that the appellants had, certainly after the report of September 5th, knowledge of the unreliable character of Sweeney's promises and statements, and ample evidence for discrediting his original financial statement and for deeming him then in a failing condition. They were at least put on notice. If they had wished more knowledge of his real assets and resources, they should have made a deeper investigation. That Sweeney had little hope of extricating himself is evident from the fact that once before September 5th and once afterwards he insisted upon shipping back some of the unsold vehicles. This they refused, doubtless relying upon the chance to do better by other means. When bankruptcy came, they knew no more than upon September 5th. Having knowledge of facts which strongly tended to show the falsity of the financial statement upon which they say they were induced to give credit, they were bound to elect whether they would stand in their original attitude of vendees

and endeavor to collect the purchase price as creditors, or at once disaffirm the sale and reclaim the goods. They had no right to speculate by taking the chance of collecting their money after knowledge of evidence which tended to show that they had been deceived. Instead of at once disaffirming the sales, they proceeded to exact performance of the agreement for payment, and made renewals even after their private investigation of September 5th had made them aware of a condition incompatible with the truth of the statement of December 28, 1906. In Simon v. Goodyear Rubber Shoe Company, 105 Fed. 573, 581, 44 C. C. A. 612, 620, 52 L. R. A. 745, we said that:

"Full knowledge of a fraud does not mean that the party defrauded shall have knowledge of all of the evidence tending to prove the fraud. If he have knowledge of the material facts which go to make up the case of deceit as practiced upon him, it is sufficient to make him elect whether he will go on with the contract, or stop short and sue for the loss he has already suffered."

This applies peculiarly to cases of mercantile sales where the misrepresentation has been as to the solvency of the buyer. The whole course of dealing between Sweeney and Ratterman & Luth after these sales had been made and the debts began to mature was pregnant with evidence of falsity of the representations upon which credit was obtained.

The judgment dismissing the intervening petition must be affirmed.