In re DORR.

CRENSHAW v. ALLEN.

(Circuit Court of Appeals, Ninth Circuit. May 6, 1912.)

No. 2,024.

1. BANKRUPTCY (§ 467*)—APPELLATE PROCEEDINGS—REVIEW—FINDINGS OF FACT.
   Where the testimony is conflicting in a bankruptcy matter, and the findings of fact of the referee and district judge are the same, the facts will not be inquired into by an appellate court, unless there is plain error.
   [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 929; Dec. Dig. § 467.*
   Appeal and review in bankruptcy cases, see note to In re Eggert, 43 C. C. A. 9.]

2. BANKRUPTCY (§ 303*)—VOIDABLE PREFERENCE—EVIDENCE.
   Evidence considered, and held to sustain a finding that a large payment by a bankrupt to a creditor a short time before the bankruptcy and when he knew himself to be hopelessly insolvent was made with intent

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

to give a preference, and accepted by the creditor with reasonable cause to believe that it was so intended.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 458–462; Dec. Dig. § 303.*]

3. BANKRUPTCY (§ 303*)—PREFERENCE—INTENTION OF DEBTOR.

If the effect of a payment by an insolvent debtor to a creditor within four months prior to the debtor's bankruptcy was to create a preference, and such was its natural and necessary consequence, he must be presumed to have intended to give a preference.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 458–462; Dec. Dig. § 303.*]

4. BANKRUPTCY (§ 165*)—PREFERENCE—TRUST FUNDS.

Money due from a bankrupt as trustee and which cannot be distinguished from any other money in his possession or under his control, or which is due from him only because he has used trust funds for his own purposes or otherwise misapplied them, cannot be considered as money held by him in trust, but constitutes an indebtedness and a payment thereon within four months prior to his bankruptcy, and, when insolvent, creates a preference.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 259, 260, 266; Dec. Dig. § 165.*]

Appeal from the District Court of the United States for the Southern Division of the Southern District of California.

In the matter of Fred Dorr, bankrupt. From an order of the District Court, affirming an order of the referee disallowing a claim presented by G. L. Crenshaw, claimant appeals. Affirmed.

Ward Chapman, of Los Angeles, Cal., for appellant.

Shankland & Chandler, Flint, Gray & Barker, and L. W. Jutten, all of Los Angeles, Cal., for respondent.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

GILBERT, Circuit Judge. The appeal in this case is taken from an order of the District Court affirming an order of the referee disallowing a claim presented by the appellant against the bankrupt's estate, which claim had been liquidated by an order of the referee in the sum of $75,460.25, and which was disallowed on the ground that the appellant had, within four months of the adjudication of bankruptcy, been paid and had accepted from the bankrupt the sum of $40,000, the payment constituting a preference over other creditors of the bankrupt. The bankrupt was a broker, and the claim arose out of purchases of corn in the year 1908 for July and September delivery by the appellant through the bankrupt on the Exchange of the Chicago Board of Trade. The July corn, consisting of 535,000 bushels, was purchased in February, 1908, at a price between 59 cents and 60 cents a bushel. At the time of the beginning of proceedings in bankruptcy, on August 12th of that year, the corn had increased in value to something over 76 cents a bushel. The most of the September corn was purchased in March of that year at about 62 cents a bushel, and had increased in value at the time of the bankruptcy to about 75 cents a bushel. A few days prior to the filing of the petition in bankruptcy, the bankrupt was suspended from the Chicago Board of Trade,

of which he had been a member, and at that time, or before, the corn which he had purchased or contracted to purchase for the appellant he had converted to his own use. On July 8, 1908, the bankrupt paid to the appellant the sum of $40,000. The bankrupt was insolvent on that date, and the referee and the court below found that by such payment he intended to give the appellant a preference, and that the payment did enable the appellant to obtain a greater percentage of his debt than other creditors of the bankrupt of the same class, and that the appellant, at the time of receiving the payment, had reasonable cause to believe that it was intended thereby to give him a preference.

[1] Where the testimony is conflicting, and the findings of fact of the referee and the District Judge are the same, the facts will not be inquired into by an appellate court unless there is plain error. Page v. Rogers, 211 U. S. 575, 29 Sup. Ct. 159, 53 L. Ed. 332; In re Sweeney, 168 Fed. 612, 94 C. C. A. 90; Canner v. Webster Tapper Co., 168 Fed. 519, 93 C. C. A. 541; First National Bank v. Abbott, 165 Fed. 852, 91 C. C. A. 538; In re Noyes Bros., 127 Fed. 286, 62 C. C. A. 218; Loveland on Bankruptcy (3d Ed.) 944.

[2] In May, 1908, an agreement was had between the bankrupt and the appellant that the latter should keep on deposit with the bankrupt a margin of three cents per bushel of all grain purchased for him by the bankrupt, and that, if the market rose so as to increase the profits of the appellant a cent or more per bushel above the margin, he was to be entitled to draw down one cent per bushel so long as he did not jeopardize the margin, and that, if the market declined a cent or more, he was to make further deposits so as to keep his margin at all times three cents per bushel, and, in cases of the delivery of grain, he was to keep up a margin of ten cents per bushel, and was to be allowed to draw down profits, but was to make good any margins made necessary by a decline in the market. Pursuant to that agreement, on May 27th, the appellant drew down $10,000 of profits, and on June 5th and 8th, being required to do so, he made deposits aggregating $25,000. The appellant was not in Los Angeles, but was in Kansas City from May 9 to July 7, 1908, but while absent he was in constant correspondence with the bankrupt by wire. On July 8, 1908, it appears from the bankrupt's books that he was indebted to the appellant in the sum of $34,000. When the appellant returned to Los Angeles on July 7, 1908, the bankrupt was in San Francisco, but Vaughn, his manager at the Los Angeles office, represented the bankrupt in most of the subsequent transactions. The appellant, on July 7th, went to the bankrupt's office, and asked Vaughn what was the condition of the market, and how much July corn had been delivered, and asked for the warehouse receipts of the corn. He was informed by Vaughn that no such receipts were in his possession, and he made the suggestion that possibly the receipts had not had time to arrive. The appellant then asked Vaughn for a payment of $49,000 or $50,000 on account. The demand was repeated on the following day, and Vaughn then informed the appellant that he did not have that much money in Los Angeles, but that he would take the matter up with the bankrupt in San Francisco. He communicated to the bankrupt by

wire the appellant's demand, and received the reply that the money would not be paid. The appellant insisted that he was entitled to the money and must have it. The bankrupt denied that he was entitled to it for the reason that his margins were not ample to take care of the large amount of grain he was carrying and that it would take a large sum to finance the deals, and that the deals had not been closed. The appellant contended that he had enough paper profits on his general accounts amply to protect his deals. Finally, at the intercession of Vaughn, the bankrupt consented to pay the appellant $40,000. Vaughn testified that the appellant was anxious to get all that was coming to him, and that he hounded him continually for the warehouse receipts, and made repeated demands for the money until he got it. On the afternoon of July 8th Vaughn gave the appellant two checks, one for $12,000 on the Broadway Bank & Trust Company and one for $2,000 on the American National Bank. The appellant was not satisfied with these payments, and demanded the entire sum, and inquired what they were going to do about the balance. Vaughn told him that was all the money that they had. The appellant demanded all the money that day, and he told Vaughn that he would be back in 30 minutes to see what they would do about the balance. Vaughn telegraphed to the bankrupt, and then gave the appellant another check for $26,000, stating at the same time that there were no funds to meet it, and telling him not to cash it until the next day, and that they would then try to make it good. The appellant agreed to return the check the next morning and get other checks in lieu thereof. On the following day he returned the check, and, in lieu thereof, received checks, one for $6,000 on the American National Bank, and two on the Broadway bank for $10,000 each; the bankrupt in San Francisco in the meantime having arranged for the money to meet the same. There is evidence in the record to show that the appellant was excited over these transactions, and that he had several conversations with Vaughn in which he inquired what the bankrupt's standing was, and on one or two occasions told Vaughn that the bankrupt was not rated in Dun or Bradstreet, and that he repeatedly expressed his lack of confidence in the bankrupt's financial condition, and said things at different times which gave Vaughn the impression that he believed the bankrupt was not financially sound, and that he insisted that, whenever he would have a profit, he wanted to get what money he could so that he would be even with the bankrupt. The bookkeeper, also, testified that the appellant seemed to be exercised over the condition of the bankrupt's business, and asked "what I thought Dorr was worth, and seemed to be agitated and anxious when asking the question." The evidence is conclusive that at the time of the payment to the appellant the bankrupt was hopelessly insolvent. At the time of the filing of the petition against him, on August 12th, his liabilities were nearly $500,000, and his assets were less than one-third that amount.

It is urged that the evidence falls short of proving that the bankrupt intended to give a preference, or that the appellant had reasonable ground to believe that he had such intention. It is true that the fact

alone that a creditor, knowing his debtor to be financially embarrassed, presses for the payment of his claim, is not sufficient to charge him with having reasonable cause to believe his debtor to be insolvent, or that the payment thus obtained is intended as a preference. But here there was proof of more than that the bankrupt was insolvent, and that the creditor was suspicious and anxious for the payment of his debt. There were other facts and groups of facts and circumstances which controlled the decision of the referee and that of the court below. One was the fact that the appellant was not only anxious and exercised about the financial condition of the bankrupt, but he was making inquiry as to his assets, and that he commented on the fact that the bankrupt was not rated by Dun or Bradstreet. Another was that the certificates or warehouse receipts for corn which was supposed to have been purchased and delivered on his account were not produced when he repeatedly demanded them, and that their absence was not explained, although the bankrupt was at that time in constant communication with the Los Angeles office by a private wire. Had the appellant made a reasonably diligent investigation, he would have found that the bankrupt was in the possession of no grain that had been delivered for him. Another was that when the appellant demanded the $40,000 payment, of which $34,000 was admittedly due him on account of sales which the bankrupt had made on his account, he was informed that the bankrupt had no money with which to pay him, and he had notice thereby that the money had been misapplied. It is true that the mere fact that the bankrupt had no money on deposit at Los Angeles was no indication that he was unable to meet his obligations, for the money might well have been on deposit in one or more of the many other banks in which he carried his accounts. But the fact, if such had been the fact, that the money was deposited in other banks, would not have prevented its immediate transfer to Los Angeles, for the evidence shows, and it is not disputed, that this could have been done "by wire instantly." Another fact is that when, on July 7th, the appellant was informed that the money could not be paid him, he still demanded checks for the full sum of $40,000, and on the following day, when he found that the bankrupt could pay him but $14,000, he demanded and received a further check for $26,000, although he knew that the check was drawn on a bank in which there were no funds available for its payment, and that on the following day he would have to return that check and receive others in lieu thereof. In short, he was advised of the desperate financial straits of the bankrupt, and we would not be justified in holding that the referee and the court below erred in holding that he was put upon inquiry to ascertain whether or not the bankrupt was solvent.

The intent of the debtor, in the absence of other proof, may be shown by its equivalent in law, proof of the inevitable result of the transaction which in the case at bar was to give a preference and create an unequal distribution of the bankrupt's estate. The bankrupt not only knew that he was insolvent, but he knew that he was so irretrievably so that he could not hope to continue his business, and he knew that he could not make the payment which he did make with-

out disparity in his payments to his other creditors. If the effect of the act was to create a preference, and such was its natural consequence, he must be presumed to have intended to do that which was the necessary result of his act. Western Tie & Timber Co. v. Brown, 196 U. S. 502, 508, 25 Sup. Ct. 339, 49 L. Ed. 571.

[3] It is contended that the payment by the bankrupt to the appellant was not a preference within the meaning of the statute, for the reason that the money did not belong to the bankrupt nor to his estate, but was on deposit with him by way of security merely, and that the appellant was entitled to draw it down as money held on deposit and in trust, and this proposition, it is argued, is sustained by the decision in Richardson v. Shaw, 209 U. S. 365, 28 Sup. Ct. 512, 52 L. Ed. 835, 14 Ann. Cas. 981. In that case Brown, the bankrupt, had been a stockbroker. Shaw & Co. had opened an account with him for the purchase and sale of stocks on a margin, and had made a deposit with him for that purpose. The account continued during a period of five months, and was then closed. Certain stocks which Brown had purchased for account of Shaw & Co. had been pledged by him. Shaw & Co., having obtained knowledge of Brown's financial condition, demanded and received the payment of $5,000. On the following day an account was made up showing the amount of securities to the credit of Shaw & Co. to be something over $45,000, and the charges to the credit of Brown something over $34,000. Thereupon Shaw & Co. paid Brown $34,000 and Brown delivered to them the securities. It was held that Brown, the broker, who carried the stocks for his customers on a margin, was a pledgee, and not the owner of the stock; that a broker who turns over to a customer upon demand and payment of advances stock which he is carrying on margin for him does not make the customer a preferred creditor; and that a payment by the broker to a customer on account of such excess margin is not a preferential payment. The transaction in that case was essentially different from that in the case at bar. In the Shaw Case the court cited with approval the decision in Markham v. Jaudon, 41 N. Y. 235, in which it was said:

"The position of the broker is twofold. Upon the order of the customer, he purchases shares of stock desired by him. This is a clear act of agency. To complete the purchase he advances from his own funds, for the benefit of the purchaser, 90 per cent. of the purchase money. Quite as clearly he does not in this act as an agent, but assumes a new position. He also holds or carries the stock for the benefit of the purchaser until a sale is made by the order of the purchaser or upon his own action. In thus holding or carrying he stands also upon a different ground from that of a broker or agent whose office is simply to buy and sell. To advance money for the purchase, and to hold and carry stocks, is not the act of the broker as such. In so doing he enters upon a new duty, obtains other rights, and is subject to additional responsibilities. * * * In my judgment the contract between the parties to this action was in spirit and effect, if not technically and in form, a contract of pledge."

In brief, the decision in the Shaw Case holds that a broker in purchasing stock for a customer is an agent; that in advancing money for the purchase he is a creditor; that in holding the stock to secure the advance he made he is a pledgee; and that the customer is not a

creditor and does not receive a voidable preference where, within four months prior to bankruptcy, he closes the transaction, pays the balance owing the broker, and receives stocks worth more in the market than the sum paid to take them up. In the case at bar there was no pledge or contract of pledge. What the bankrupt did for the appellant was to purchase options, or the right to buy grain for future delivery. The appellant paid the bankrupt 3 per cent. of the value of the grain which he wished to purchase. He did not aim to purchase grain at that time, but to secure the right to purchase it at a future time. The bankrupt telegraphed the orders to Wrenn & Co., members of the Chicago Board of Trade. They went upon the Exchange in Chicago and entered into a contract with some other member thereof by which the latter agreed to deliver to them at any time in the month named the amount of corn specified in the order. Under the contract no grain was delivered to the bankrupt, and he made no advances thereon and held nothing in pledge. He was accountable to the appellant for balances in his favor, if any there were after selling the grain and making such offsets as were chargeable against the proceeds. It is probable that all or most of the claims against the bankrupt's estate were of the same class as that of the appellant.

[4] Money due from a bankrupt as trustee, and which cannot be distinguished from any other moneys in his possession or under his control, or which is due from him only because he has used trust funds for his own purposes, or otherwise misapplied them, cannot be considered as property held by the bankrupt in trust. In re Richard (D. C.) 104 Fed. 792; In re Marsh et al. (D. C.) 116 Fed. 396; In re Mulligan (D. C.) 116 Fed. 715. In the case last cited Judge Lowell said:

"The mere misapplication of trust funds does not create in favor of the defrauded beneficiary a claim upon the general estate of the defrauding trustee superior to that of his general creditors. * * * The burden of tracing the trust fund into the property claimed rests upon the beneficiary who claims it. He may be assisted in bearing this burden by the legal presumption above mentioned concerning the application of checks drawn against a bank account; but the burden of proof is upon him. The priority already referred to which has sometimes been given to the cestui in the application of the cash assets of a bank which has mingled the trust fund with its own funds, whether defensible or not, is limited to the case of the cash assets of a bank, and is not extended to other kinds of defaulting trustees or to other assets of the bank."

In Re Miller and Brown (D. C.) 135 Fed. 868, it was held that where the claimant sold certain goods to a bankrupt firm who were entitled to sell the goods at their discretion, their only obligation being to pay the price on sales made or return the goods, the transaction amounted to nothing more than a contract of sale and return, and that the claimant was not entitled to recover the goods unsold as against the firm's trustee in bankruptcy. In Deere Plow Company v. McDavid, 137 Fed. 802, 70 C. C. A. 422, it was held that, where a bankrupt improperly mingled funds belonging to its principal with its own funds, and it was not shown that the trust funds, either in their original or substituted form, came into the hands of the bankrupt's trustee the principal was not entitled to a preference therefor.

The judgment is affirmed.