SPARKS v. MARSH et al.

(District Court, E. D. Arkansas, W. D. April 4, 1910.)

No. 490.

1. BANKRUPTCY (§ 159*)—PREFERENCES.

To set aside and recover an alleged preference in violation of Bankr. Act July 1, 1898, c. 541, § 60b, 30 Stat. 562 (U. S. Comp. St. 1901, p. 3445), it must be established by competent proof that the bankrupt was insolvent when he made the payment, that he intended it to be a preference, and that the creditor receiving it or benefited thereby had reasonable cause to believe that it was so intended.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 247; Dec. Dig. § 159.*]

2. BANKRUPTCY (§ 303*)—PREFERENCES—VACATION—INTENT TO PREFER—KNOWLEDGE—EVIDENCE.

In a suit to recover an alleged preference, evidence, while sufficient to show that the bankrupt intended to give a preference, *held* insufficient to show that the creditor had reasonable ground to believe that the bankrupt was insolvent, or that a preference was intended, under the rule that mere grounds of suspicion that a debtor is insolvent or that a payment is in-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

tended to create a preference is insufficient to establish that the creditor receiving it had reasonable cause to believe that a preference was intended.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 462; Dec. Dig. § 303.*]

In Equity. Suit by Charles C. Sparks, trustee of the estate of J. S. White, bankrupt, against T. T. Marsh and another, to recover an alleged preference. Bill dismissed.

The object of the bill is to recover the sum of $1,000 alleged to have been paid by the bankrupt to the defendants, creditors, four days before involuntary proceedings in bankruptcy were instituted against him, which payment it is charged was made by the bankrupt to the defendants "when insolvent and in contemplation of bankruptcy and was received by the defendants with knowledge of the insolvency of the bankrupt and with such information as would put a reasonable person upon notice that the bankrupt was insolvent," and said payment, it is claimed, constituted an unlawful preference.

The answer of the defendants admits the allegations in the bill, except that it denies that "the payment was an unlawful preference, and that it was received by the defendants with knowledge of the insolvency of said bankrupt or with such information as would put a reasonable person upon notice that said White was insolvent, and that said payment constituted an unlawful preference, or that defendants had reasonable cause to believe that a preference was intended."

Rose, Hemingway, Cantrell & Loughborough, for plaintiff.
Moore, Smith & Moore and H. M. Trieber, for defendants.

TRIEBER, District Judge. There is no direct evidence that the defendants had any knowledge of the bankrupt's insolvency, or that the payment was intended as a preference at the time it was made, but it is claimed that the evidence establishes the fact that they had such information as would put a reasonable person upon notice that the debtor was insolvent at the time, and that the payment was intended as a preference within the meaning of the bankruptcy act.

The evidence establishes the following facts: That the defendants are, and have been since 1903, engaged in the liquor business, owning a saloon and having an interest in some other saloons, and are also wholesale dealers in beer in the city of Hot Springs. That up to July, 1908, they were also engaged in a general mercantile business with one Williams as a partner, which was located at Oaklawn, about 1½ miles from Hot Springs. That that business was operated under the name of the Oaklawn Mercantile Company, and was in charge of Williams. That in July, 1908, the partner, Williams, suddenly left, and thereupon the defendants took charge of the business. The stock of merchandise, which consisted of dry goods, groceries, and feed stuffs, invoiced $1,991.50, and the liabilities amounted to about $1,500, of which $1,000 was due the Bunch Grain Company and $500 to Plunkett & Jarrell. That the defendant Marsh on his way to Oaklawn met the bankrupt White, with whom he had had business transactions theretofore, as will be hereinafter set out, and who had had some experience in mercantile business of that nature and employed him to assist in taking an invoice of the goods on hand. The bankrupt and the defendant Wheatley had known each other for a long time, and the bankrupt had also known the defendant Marsh, and had business trans-

actions with him for a number of years. In 1904, when the defendants were in the mercantile business, they bought goods from White. Afterwards White opened a saloon in the city of Hot Springs, and defendants furnished him with the money to pay for his license, and also with some whisky and all the beer he used on credit. White remained in that business for one year, during which time the transactions between him and the defendants were very satisfactory. Thereafter he worked for the defendants for five months as barkeeper in one of their saloons, and afterwards, until July, 1908, White was engaged in other vocations. After the invoice of the Oaklawn Mercantile Company stock had been taken by the defendant Marsh and White, which was found to be of the value of $1,991.50, Marsh proposed to White to sell him the business on credit, as defendants could not give it much attention, and White was familiar with such business. White had no means to pay for it, so it was agreed that he should assume the Bunch Grain Company debt, amounting to $1,000, and execute his note to the defendants for the $991.50 balance, payable on June 1, 1909, with 8 per cent. interest per annum. The Bunch Grain Company was willing to accept the notes of White for the indebtedness if indorsed by the defendants as sureties. Thereupon White executed to the grain company 10 notes for $100 each, which were indorsed by the defendants. The storehouse was rented by defendants to White, and the rent was promptly paid by him monthly. On March 1, 1909, White borrowed $1,000 from the Arkansas National Bank of Hot Springs to be used in his business; defendants indorsing the note as sureties. The Bunch notes were duly paid as they matured, and in April, 1909, only two of them were still unpaid. On that day White sold out his stock of merchandise to one Wheatley, a brother of one of the defendants, but, so far as the evidence shows, he had no connection with the defendants. The price paid for the stock was $2,500 in cash. The stock invoiced from $3,000 to about $3,500, and White had about $3,000 in accounts due him from customers which were not included in the sale, but a part of them had been assigned before to another creditor. The purchase money received by White was used to pay the thousand dollar note held by the Arkansas National Bank and indorsed by the defendants, the $991.50 note due to the defendants, and other debts. Neither of these two notes were due at that time, and upon the solicitation of White, the defendants, although at first they refused to do so, remitted the interest on their note amounting to $55.10. There is no evidence tending to show that the defendants, or either of them, knew at the time that White was insolvent, or that he had sold out his store. Marsh, the member of the firm who attended to this matter, testified positively that he did not know that White was insolvent, but, on the contrary, believed him to be doing a prosperous business; that every month he collected the rent from him, which was paid promptly, and in conversation with White a short time before he told him that he was making about $100 per month over and above all his expenses, including his living expenses; that in speaking to one of the wholesale dealers from whom White bought goods extensively he was informed that White paid his bills promptly, and seemed to be doing well. White also testified that he did not consider himself insolvent at the

time, and that, if no bankruptcy proceedings 'had' been instituted, he thought he could have paid all his debts with the collections of his accounts and the sale of some timber lands belonging to his son who had authorized him to sell it and use the money realized in his business and for the purpose of paying his debts. The law is now well settled that, to set aside or recover a preference under the provisions of section 60b of the bankruptcy act, it must be established by competent evidence that the bankrupt was insolvent at the time he made the payment, that he intended it as a preference, and that the creditor receiving it or benefited thereby had reasonable cause to believe that it was intended thereby to give a preference. Coder v. Arts, 152 Fed. 943, 82 C. C. A. 91, 15 L. R. A. (N. S.) 372, affirmed 213 U. S. 223, 29 Sup. Ct. 436, 53 L. Ed. 772; In re Leech, 171 Fed. 622, 96 C. C. A. 424.

The insolvency of White being admitted, the first question to be determined is: Did he, when he made the payment to defendants, intend it as a preference? Considering the relationship existing between the parties, the friendship of years, and the assistance rendered him by the defendants at various times, there is little room for doubt, and the court so finds, that the payment was made by White with the intent to give a preference within the meaning of section 60a of the bankruptcy act. Did defendants have reasonable cause to believe that this was his intention? There is no direct evidence to establish that fact, but mere surmises arising, it is claimed on behalf of the complainants, from the circumstances shown to have prevailed at the time. No evidence whatever has been offered to show that defendants or either of them knew White to be insolvent. The only evidence on that point is that of the defendant Marsh, who testified positively that he did not know it, but that from what White had told him about his business, the promptness with which he paid his rent, and as a result of the inquiry he made of Plunkett & Jarrell, the wholesale house with which White was dealing, he believed him to be making money, about $100 a month over and above all his expenses. While the personal relations existing between the parties might raise a presumption that defendants knew White's financial condition, this presumption is satisfactorily rebutted by the fact that they indorsed a note for $1,000 only a month before that time, and that the several notes for $100 each given to the Bunch Grain Company and indorsed by the defendants were promptly paid by White, as nonpayment of any of them would have led to protest and notice to the defendants as indorsers. These acts are certainly strong circumstances to dispel the presumption of knowledge of insolvency, for it is hardly reasonable to suppose that they would have become indorsers on a note for $1,000 if at the time they doubted his solvency and consequent ability to pay it at maturity.

The well-settled rule of law is that mere grounds of suspicion that a debtor is insolvent or that a payment made by him is intended to create a preference are insufficient to establish the fact that the creditor who received it has reasonable cause to believe that a preference was intended thereby. There must be substantial evidence, of reasonable grounds for such belief. Grant v. National Bank, 97 U. S. 80, 24 L. Ed. 971; Stucky v. Masonic Savings Bank, 108 U. S. 74, 2 Sup. Ct. 219, 27 L. Ed. 640; Hussey v. Richardson-Roberts Dry Goods Co.,

148 Fed. 598, 78 C. C. A. 370; Tumlin v. Bryan, 165 Fed. 166, 91 C. C. A. 200, 21 L. R. A. (N. S.) 960; First National Bank v. Abbott, 165 Fed. 852, 91 C. C. A. 538.

In Grant v. National Bank Mr. Justice Bradley, speaking of the provision "having reasonable cause to believe such person insolvent" in the bankruptcy act of 1867, said:

"It is not enough that a creditor has some cause to suspect the insolvency of his debtor: but he must have such a knowledge of facts as to induce a reasonable belief of his debtor's insolvency, in order to invalidate a security taken for his debt. * * * A man may have many grounds of suspicion that his debtor is in failing circumstances, and yet have no cause for a well-grounded belief of the fact. He may be unwilling to trust him further. He may feel anxious about his claim and have a strong desire to secure it, and yet such belief as the act requires may be wanting. Obtaining additional security, or receiving payment of a debt, under such circumstances, is not prohibited by the law. * * * Hence the act, very wisely, as we think, instead of making a payment or a security void for a mere suspicion of the debtor's insolvency, requires, for that purpose, that his creditor should have some reasonable cause to believe him insolvent. He must have a knowledge of some fact or facts calculated to produce such a belief in the mind of an ordinarily intelligent man."

In Hussey v. Richardson-Roberts Dry Goods Co. the facts were that a mercantile creditor had sold a bankrupt goods only a few months prior to his bankruptcy. He was slow in making payments, and, learning that he had placed a mortgage on his stock, the creditor sent an attorney to look after the claim. The bankrupt stated to him that he did not have sufficient capital to meet his bills promptly, but was doing a profitable business and was entirely solvent; that he had an offer for his stock in cash and land amounting in value to a sum largely in excess of his indebtedness which he could not accept at once. The attorney advised its acceptance, and in the meantime took a chattel mortgage on the stock for the amount of his claim. The debtor was, in fact, insolvent, and became a bankrupt within four months thereafter. Upon these facts, it was held, Judge Adams delivering the opinion of the court, that such a showing supported the finding of the District Court that the creditor did not have reasonable cause to believe when the mortgage was taken that a preference was intended, and therefore it was not void under section 60b of the bankruptcy act (Act July 1, 1898, c. 541, 30 Stat. 562 [U. S. Comp. St. 1901, p. 3445]).

Great stress is laid on the fact that the payments to the bank and the defendants were made before the maturity of the notes. There is no evidence whatever to show that when the defendants received payment that they had any knowledge of the fact that the bank had been paid, but, even had they been advised of that fact, that alone would not have justified a finding that they had reasonable cause to believe the payment was intended as a preference. When White had the money to pay these debts, what would be more natural than that he should do so, especially if by paying the note held by the defendants he saved the accumulated interest amounting to over $50?

In Wright v. Sampter (D. C.) 152 Fed. 196, the facts were much stronger than those in this case. There the defendant had had money on deposit with a bankrupt firm of which her uncle was the financial head, he being a man of supposedly large means. Nine days before insolvency proceedings in bankruptcy were begun against the firm she

received by mail a letter inclosing a check for the full amount of her deposit and interest, with the statement that the firm could no longer use her money. Neither the defendant nor her sister nor mother, who also used the firm as a depositary and received similar checks, had any suspicion that it was embarrassed. The firm was in fact insolvent on the day the checks were sent. Upon these facts it was held that they were insufficient to show that the defendant had any reasonable cause to believe that the payment to her was intended to constitute a preference within the meaning of section 60b of the bankruptcy act.

Upon the findings made by the court, the defendants are entitled to a decree dismissing the bill.