## TILT v. CITIZENS' TRUST CO. et al.

### (District Court, D. New Jersey. October 30, 1911.)

**1.** BANKRUPTCY (§ 166*)—VOIDABLE PREFERENCE—NOTICE OF DEBTOR'S INSOLVENCY.

A creditor of a bankrupt who took security within four months prior to the bankruptcy with notice of facts which would incite a man of ordinary prudence to inquiry as to the solvency of the debtor is chargeable with notice of all facts which a reasonably diligent inquiry would have disclosed.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 250-258; Dec. Dig. § 166.*]

**2.** BANKRUPTCY (§ 303*)—VOIDABLE PREFERENCE—NOTICE OF INSOLVENCY.

Evidence considered, and *held* to show that a bank which within four months prior to the bankruptcy of a lumber company, and when it was insolvent, took from such company a large part of its assets, including practically all of the bills receivable taken by it in the course of its business as security for an antecedent indebtedness, without making inquiry as to its solvency except from the president of the company and its attorney, had reasonable cause to believe that it was insolvent, and intended a preference, which rendered such transfers voidable at suit of the bankrupt's trustee.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 462; Dec. Dig. § 303.*]

**3.** BANKRUPTCY (§ 161*)—VOIDABLE PREFERENCE—TRANSFERS IN EXECUTION OF PRIOR AGREEMENT.

Transfer of property to a creditor by an insolvent within four months prior to its bankruptcy, which would otherwise constitute a voidable preference, are not deprived of that character by the fact that they were made pursuant to a prior agreement made more than four months before bankruptcy.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 263; Dec. Dig. § 161.*]

In Equity. Suit by Edgar M. Tilt, trustee in bankruptcy of the Smith Lumber Company, against the Citizens' Trust Company and Albert D. Cheston. Decree for complainant.

Esselstyn & Haughwout and Julius Henry Cohen, for complainant.
Frederick W. Van Blarcom and Clifford L. Newman, for defendants.

CROSS, District Judge. The complainant is the trustee in bankruptcy of the Smith Lumber Company, against which an involuntary petition in bankruptcy was filed July 20, 1909, whereon it was adjudicated a bankrupt on September 27th following. The Smith Lumber Company, hereafter called the Lumber Company, was a New York corporation organized in the year 1908 for the purpose of buying, selling, manufacturing, and dealing in lumber, and had its principal place of business in Paterson, in this state. The defendant the Citizens' Trust Company, hereafter called "Trust Company," is a general banking institution carrying on its business in said city of Paterson. The defendant Cheston is employed by the Trust Company as an assistant to the treasurer, and has no particular interest in this contro-

versy, other than that he holds in trust for the benefit of the Trust Company the title to certain property transferred to him by the Lumber Company within four months of its bankruptcy, which transfers the bill of complaint alleges were made when the Lumber Company was insolvent and under circumstances which constituted them an unlawful preference under the bankruptcy act (Act July 1, 1898, c. 541, 30 Stat. 544 [U. S. Comp. St. 1901, p. 3418]). The testimony discloses that early in the month of February one Smith, who was the president of the Lumber Company, requested Henry F. Bell, the president of the Trust Company, to purchase from it a certain promissory note, and in such negotiation represented that it would have from time to time in the course of its business other notes which it would like to sell to the Trust Company; that the Lumber Company would guarantee the payment of any and all notes which might be purchased by the Trust Company, and would open with it a general banking or deposit account, and maintain therein, at all times, a cash balance equal to 25 per cent. of the amount of the unpaid notes purchased from it by the Trust Company, and that against such balance the Trust Company could charge any notes that were not paid at maturity by the makers or indorsers thereof. The Trust Company thereupon agreed to buy at its discretion such notes as might be offered for sale by the Lumber Company upon the understanding that the Lumber Company was to open an account with the Trust Company, as above mentioned, and maintain therein a cash balance of the amount and for the purpose above expressed. Upon this understanding the Trust Company purchased the note then offered for sale by the Lumber Company, and subsequently, and between the date of that purchase, February 7, 1909, and April 16, 1909, purchased 85 other notes, aggregating in amount upwards of $30,000, all of which were indorsed by the Lumber Company. The Trust Company did not, however, purchase any notes from the Lumber Company after April 16, 1909. At or about that time the Lumber Company's account had become unsatisfactory and its condition was called to the attention of Smith, who apparently made an effort, and for a few days with some degree of success, to restore it to the required amount. Later, however, in that month and throughout the month of May, and the early part of June, a considerable number of the notes which had been purchased by the Trust Company went to protest, and were thereupon charged against the account of the Lumber Company. Accordingly it appears that by the 7th of June, 1909, its balance with the Trust Company was reduced to $8.76, and was never thereafter larger, but, on the contrary, it was subsequently still further depleted by a charge against it of $1.02 which reduced it to $7.74, at which amount it stood at the time when the alleged preferential transfers were made, and also when the bankruptcy proceedings above referred to was instituted. Furthermore, it appears that for some time prior to June 7th its balance had been quite small; for instance, on May 7th it was but $800, an amount which it never again equalled. This condition of affairs was apparently alarming to the officials of the Trust Company, and it is not surprising therefore to find, as already intimated, that from the 16th of April, 1909, the date when

the Trust Company ceased buying notes from the Lumber Company, Mr. Bell, its president, earnestly endeavored to have the depleted bank balance restored, and, with this object in view, saw Smith frequently, and at times almost daily.

It also appears that Mr. Cheston, one of the defendants, for several years prior to his connection with the Trust Company, had been an employé of Dun's Commercial Agency, and that as such employé it was his duty to investigate in its behalf, when required, the commercial and financial standing of divers persons and corporations; that while thus engaged he had desk room in the offices of a firm of attorneys in Paterson, which firm included in its membership the complainant, and conducted a collection business of considerable importance; that a close and friendly relationship existed between the complainant and Cheston during that period and subsequently; and that for their mutual benefit and advantage they exchanged any information that they obtained relative to the financial ability of any person or persons in whom, from time to time, they were severally interested, and that Mr. Cheston always had access to the claim docket of said attorneys. It further appears that Cheston, because of his ability and experience in that direction, was accustomed, and it was his duty as an employé of the Trust Company, to investigate the business standing and responsibility of persons and corporations when desired by that company. Accordingly the evidence discloses that, when the balance of the Lumber Company's account with the Trust Company had become reduced almost to the vanishing point, Cheston very frequently visited the offices of said attorneys, and invariably made inquiry as to what they knew of the affairs of the Lumber Company; that towards the end of June and early in July so much eagerness was manifested by Cheston at these interviews that a suspicion was engendered in the mind of Tilt that the Trust Company was deeply interested in the financial condition of the Lumber Company, but Cheston never, at these interviews, made any disclosure of the relationship existing between the companies, other than that the Lumber Company kept an account with the Trust Company. In the course of these interviews Cheston was informed by Tilt that as early as May he had received a great many inquiries about the Lumber Company, and had also received for collection a small claim during that month, which, however, had been settled; that on June 10th a claim for $81.12 had been received upon which suit was instituted July 2d, and judgment entered by default; that on the same date another claim for $293.50 had been received, which was also put in suit and judgment entered thereon without defense; that on June 30th a claim for $1,034.34 had been received upon which suit was begun on July 2d, and judgment entered subsequently by default; that on July 4th a claim for $477.68 had been received, upon which suit was also instituted, and that on July 13th three claims had been received of the following amounts: $4,001.40; $393.76; and $150.17. Some of the foregoing claims had been overdue for several months. While these claims were being received, Mr. Tilt went daily, and sometimes twice a day, to the office of the Lumber Company, endeavoring to find Mr. Smith, in which attempt he

failed. He accordingly left word with Smith's stenographer that Mr. Smith should either come and see him, or call him up on the telephone. He never succeeded in seeing him but once, however, at which time Smith said he could not pay the claims, but would give him notes, which Tilt refused to accept. Mr. Tilt testified that Cheston knew not only of the claims which from time to time had been sent him for collection, but how they were being dealt with by him and by Smith. Moreover, Tilt says he told Cheston, referring to Smith's avoidance of Tilt, that he would not stand any nonsense from Smith; that, if the Lumber Company did not pay up, he was going to file a petition in bankruptcy against it. Cheston, however, denies this, as well as some other matters in connection therewith concerning which the complainant testified, but I am satisfied, after careful consideration of their evidence, that Tilt actually knew, as Tilt says, all that he knew concerning the affairs of the Lumber Company. Not only does this appear directly from Tilt's evidence, but it may fairly be inferred from their former habit of exchanging information, and from the intimate relationship still existing between them, as well as from the prompt action taken by the Trust Company towards securing its claim against the Lumber Company, at the very time when Tilt's information, if imparted as he says it was, became of the utmost interest to the Trust Company. Nor is there any apparent reason why at that time Tilt should not have told Cheston what he swears he did. Cheston had every reason to seek information and Tilt no reason to withhold it. This explains, as already intimated, why on June 24th the Trust Company engaged in an effort to secure its claims which continued down to the very date when the petition in bankruptcy was filed against the Lumber Company. Mr. Bell, the president of the Trust Company, testified that Smith, when pressed to restore his cash balance according to his agreement, said that he could not, but that he had bills receivable which he would assign as collateral. Accordingly, on June 24th, the Smith Lumber Company executed a promissory note to the Trust Company for $804.45, maturing the following day, and as collateral thereto assigned accounts for the following amounts: $301.94 and $502.51; and on June 25th executed a note of $1,073.03 maturing on the following day and assigned as collateral thereto accounts for the following amounts: $234.58 and $838.45. Almost immediately after this, however, the Lumber Company, according to Bell, objected through Smith, to assigning any more accounts. This appears from the following question and answer taken from the testimony of Mr. Bell:

"Q. Was any reason given to the Citizens' Trust Company by the Smith Lumber Company why they would not continue to transfer or assign book accounts, and why they substituted the New York State property in place thereof? A. They stated that they were conducting a wholesale lumber business, buying lumber and selling it, and that they required the money coming in from their accounts to pay the bills for this lumber which they purchased in the South and elsewhere."

Accordingly, on June 30th, the Lumber Company executed to Mr. Cheston, admittedly for the benefit of the Trust Company, three instru-

ments in writing, by which it transferred to him logs and timber, cut and uncut, lying and being in the state of New York. Of these instruments two transferred property located in the county of Ulster and the other in the county of Delaware. On the 3d of July it also transferred to Cheston for a like purpose another quantity of lumber and logs located in the county of Ulster. Reference will be made later to the value of the property transferred by these four conveyances, and to the disposition made of it. The disinclination of the Lumber Company, as testified to by Mr. Bell, to assign any more accounts to the Trust Company as collateral security does not seem to have been long continued or difficult to overcome, for on July 3d the Lumber Company executed to the Trust Company three promissory notes, all payable July 5th, one for $58.80 as collateral to which it assigned an account for a like amount; another for $779.66, for which it assigned accounts for $243.14 and $536.52; and the third for $150, for which apparently no collateral was given. On July 6th, it executed another note payable the following day for $257.94, and assigned as collateral thereto an account for a like amount. On July 8th it executed another note for $50 payable on the same day for which it assigned as collateral an account for $60. On July 13th it executed another note for $58.80 payable on the same day for which it assigned as collateral an account for $58.80. On July 14th it executed another note payable on the 15th for $1,261.74 for which it assigned as collateral an account of the same amount. On July 14th it executed two notes payable on the 15th, the first for $4,451.93 as collateral to which it assigned accounts of the following amounts: $2,466.56; $294.10; $485.46; $429; $175; $334.29; $134.16; $22.75; $36.26; and $74.35. The second note of that date was for $258.64, and the following accounts were assigned as collateral thereto: $48.71; $54; $76.48; $41; $1; and $37.45. On July 17th it executed a note, payable on the following day, for $151.88, for which it assigned an account for a like amount, and on July 20th, the date of the filing of the petition in bankruptcy against the Lumber Company, it executed another note to the Trust Company payable the following day for $397.40, for which it assigned as collateral accounts for $193.12 and $204.28. No present consideration was given for any of the above-mentioned notes, assignments, or conveyances. The property conveyed and the accounts assigned were, as admitted by the answer, all taken for the purpose of securing to the Trust Company payment of the notes purchased by it from time to time. The object of this suit is to set aside such transfers and conveyances, because, as claimed, they constitute illegal preferences under the bankruptcy act.

It should be noted at this point that, after the institution of the bankruptcy proceedings against the Lumber Company, Smith, together with his father-in-law, formed another corporation to which the Trust Company, through Cheston, conveyed for a net consideration of $6,500 all of the timber and logs situated in Ulster and Delaware counties which had been assigned and conveyed to him by the Lumber Company. This circumstance is suspicious as suggesting prearrangement,

but, aside from that, has significance, in that it shows an intimate business relationship as still existing between the Trust Company and Smith.

The facts disclosed by the evidence and already referred to concerning the nature, character, duration, and extent of the effort made by the Trust Company to secure its indebtedness are not only unusual, but remarkable, and such as to demand and require a full, clear, and frank explanation. They show one corporation exacting, or, if that word be too harsh, accepting from another, at a time when it is known to be without cash, and hard pressed by its creditors, a very large proportion of its assets. They show that the Trust Company, even while it was engaged in acquiring practically all of the Lumber Company's quick assets, in the shape of bills receivable from which alone it could procure cash for the continuance of its business, was not satisfied, but proceeded to take over also a large part of the timber and logs which the Lumber Company in the regular course of its business was accustomed to sell after manufacturing them into lumber. Such transactions obviously could not, no matter how intended, result otherwise than in disaster and bankruptcy to the Lumber Company. And this remains true notwithstanding the fact that that company did retain a few accounts, which Smith says had no value, and some property of the extent or value of which, however, Mr. Bell had no real or definite knowledge, as appears from the following questions and answers taken from his testimony.

"Q. Did you know what properties composed the assets of the Smith Lumber Company other than that which was transferred to you? A. Yes, to some extent.

"Q. And the values? A. Not the values.

"Q. What properties did you know of besides what you got? A. Property in Pennsylvania, lumber and book accounts and the interest in property in Maine.

"Q. From whom did you get the information? A. Smith

Disregarding for the moment the source of this information, it is manifest, as already stated, that Mr. Bell had no knowledge of the value, and very little, if any, as to the amount or character of the property retained by the Lumber Company, and yet on the very next page of his testimony, while attempting to justify the conduct of the Trust Company, he swears that he considered the property retained by the Lumber Company sufficient to pay all its debts and leave a surplus, and that he had no knowledge at the time he received the transfer which lead him to believe that the Lumber Company was insolvent. Had he made inquiries, however, such as the situation demanded, he would have ascertained—indeed, Smith says that he told him—that the accounts were practically all gone, and that those remaining were of little or no value. He would also have ascertained that nothing but notes had been given for the Maine property, which indeed was subsequently repossessed by its former owner, and that the property in Pennsylvania which Smith had valued at $10,000 was worth much less, and, according to an inventory subsequently made in the bankruptcy proceeding, less than $5,000.

[1] In further considering the question whether or not the of-

ficers and agents of the Trust Company, when they accepted the transfers above mentioned, had reasonable cause to believe that it was thereby intended to give the Trust Company a preference over other creditors of the same class, it should be borne in mind, as has been held by several Circuit Courts of Appeal, that:

"Notice of facts which would incite a man of ordinary prudence to an inquiry under similar circumstances is notice of all the facts which a reasonably diligent inquiry would disclose." Coder v. McPherson, 152 Fed. 951, 953, 82 C. C. A. 91; Wright v. William Skinner Mfg. Co., 162 Fed. 315, 317, 89 C. C. A. 23.

[2] Certainly the circumstances disclosed to Mr. Bell in this case were amply sufficient to put a man of ordinary prudence upon inquiry. He knew that the debtor was without cash, and was being pressed by his creditors. He did not have presented the usual case of cash payments made by a debtor in the regular course of business, but the contrary. The transactions were of a peculiar nature, securing notes maturing one day from date, a circumstance indicative of haste and distrust; were so long continued in point of time and covered such a variety and amount of assets as would inevitably have caused any reasonably prudent person to stop and consider.

When a person accepts from its debtor, as the president of this Trust Company accepted, an assignment of a book account for but a single dollar, as collateral security to the debtor's promissory note, and this after a multitude of like accounts, but of large amounts, had already been transferred as security for the payment of several other notes of the same debtor, who was known to be hard pressed, it must inevitably occur to him that the debtor's assets are practically exhausted. The inquiry, if such it can be called, made in behalf of the Trust Company was not, under the circumstances, reasonably careful or sufficient. According to Mr. Bell's own testimony, he acted upon what Smith, the president of the Lumber Company, and its counsel, told him at or about the time the transfers of property were being arranged for, which information was to the effect that the Lumber Company was solvent to the extent of $40,000 or $50,000. But such inquiry as was made of the counsel of the Lumber Company appears to have been made after some of the accounts had actually been assigned, and after Smith and Bell had arranged for the transfer of the New York property. This is shown by the testimony of the counsel, who, after stating that he went to the Trust Company "upon the matter of the indebtedness of the Smith Lumber Company to the Citizens' Trust Company," testifies as follows:

"I had seen Mr. Bell once before on the same matter, and Mr. Smith, the president of the company, was in almost daily, and we had been trying to arrive at some method whereby the bank would be satisfied that its claims against the Smith Lumber Company would be paid, and whereby the Smith Lumber Company could continue to do business."

And, further testifying, says, in substance, that he was called into the matter because his client was in "trouble and had called on him for help"; that he first learned of the trouble "many weeks before this date in June" (apparently referring to the date when he was at the Trust Company's office to arrange for the transfers of the New York

property); that prior to that time he had had daily interviews, "almost numberless times," with Mr. Smith, solely in reference to the Trust Company's claim, and that he had no knowledge of the Lumber Company's affairs except as derived from Mr. Smith. It was at the time and under the circumstances above mentioned that he was asked to give, and gave, his opinion as to the solvency of the company which he represented.

Keeping in mind that the counsel of the Lumber Company was then present for the very purpose of arranging a method whereby it could continue to transact its business, it becomes obvious that counsel could not reasonably have been expected, by an admission of its insolvency, not only to defeat the object of the interview, but also to betray the interest of his client. Mr. Bell therefore had little right to ask the question, and no right to rely on its answer. The duty of making reasonably adequate and intelligent inquiry still rested upon him, and, in view of what he already knew, that duty was not discharged by inquiries made to Smith or to the counsel of the Lumber Company. The whole affair was an afterthought, and savors of an attempt, although hardly a clever one, on the part of the Trust Company, acting through its president, to fortify its position in case bankruptcy proceedings should subsequently be instituted. If such an inquiry as was made in this matter were held to be reasonably adequate and sufficient, an easy and safe method has been found for the creation of illegal preferences.

Nor is this all, for going back to the month of March, when the business relation between the Lumber Company and the Trust Company above referred to was first instituted, the evidence shows that the Trust Company had obtained a report from the Dun Commercial Agency purporting to show the financial standing of the Lumber Company, but an inspection of it shows that it was obviously nothing more than Smith's own statement, although made in behalf of the Lumber Company. Apparently the Trust Company was not satisfied with it, and accordingly asked Mr. Tilt to procure letters, concerning Smith's financial standing, from certain attorneys in Pennsylvania where Smith had formerly resided and carried on business. Two such letters were received in reply to Tilt's requests, one of them of a favorable character, but, when it was subsequently ascertained that it came from a former attorney of Smith, Tilt was requested to procure another, which he did. This letter bears date March 9, 1909, and states that Smith had no property there, and that there were "quite a number of judgments still entered and unsatisfied against him," and closes with this suggestive clause, "I would advise any one dealing with him to see that they get proper security for any of his obligations." Considering the fact that Smith or Smith and his father-in-law constituted the Lumber Company, it is manifest that the Trust Company from the inception of its business relations with Smith and the Lumber Company was put upon its guard, and this notwithstanding it also appears that he had subsequently come into possession of some money from his mother's estate, which enabled him to organize the Lumber Company. That the officers and agents of the Trust Com-

pany never forgot, but constantly kept in mind, the information which they had received concerning Smith's former affairs, might well be inferred, if there were nothing else in the case, from the promptness with which at the first appearance of distress and embarrassment on the part of the Lumber Company they seized for their company, in disregard of the rights of other creditors, a very large proportion of the assets of the Lumber Company.

It makes no difference, however, under the testimony, what Mr. Bell, representing the Trust Company, believed in respect of the insolvency of the Lumber Company at the time the several transfers above mentioned were made, since the real question is, as already stated, not what he believed, but what he had reasonable cause to believe in respect thereto, and it seems to me that this question can only be answered by saying that he had at the time the transfers and conveyances were made to the Trust Company reasonable cause to believe that the Lumber Company was insolvent, and that the Trust Company in accepting the transfers and assignments referred to was accepting a preference within the meaning of the bankruptcy act.

Turning to the question of whether or not the Lumber Company was insolvent at the time the above-mentioned accounts and property were made by it to the Trust Company, it can be said with assurance, under the evidence, that it was. This so conclusively appears that it is not deemed worth while to prolong this opinion by a consideration of the testimony.

It furthermore appears from the testimony that the Trust Company has received, through and by reason of the above-mentioned transfers, a greater percentage of its claim than other creditors of the bankrupt of the same class have received, or will receive.

[3] It should be added that the conclusion arrived at in this case is not affected by the fact of the oral agreement already referred to by which Smith, acting for the Lumber Company, undertook more than four months prior to the filing of the petition in bankruptcy to open an account with the Trust Company and maintain therein at all times a cash balance equal to 25 per cent. of the unpaid notes purchased by the Trust Company.

See In re Great Western Mfg. Co., 152 Fed. 123, 127, 81 C. C. A. 341, 345, and the cases appearing in the following extract therefrom:

"A mortgage or transfer of his property by an insolvent debtor within four months of the filing of a petition in bankruptcy against him, which otherwise constitutes a voidable preference, is not deprived of that character or made valid by the fact that it was executed in performance of a contract to do so made more than four months before the filing of the petition. Wilson v. Nelson, 183 U. S. 191, 198, 22 Sup. Ct. 74, 46 L. Ed. 147; In re Sheridan (D. C.) 98 Fed. 406; In re Dismal Swamp Co. (D. C.) 135 Fed. 415, 417, 418; In re Ronk (D. C.) 111 Fed. 154; Pollock v. Jones, 124 Fed. 163, 61 C. C. A. 555; Anniston Iron & Supply Co. v. Anniston Rolling Mill Co. (D. C.) 125 Fed. 974; Johnston v. Huff, Andrews & Moyler Co., 133 Fed. 704, 66 C. C. A. 534; In re Mandel (D. C.) 127 Fed. 863. In Wilson v. Nelson, 183 U. S. 191, 198, 22 Sup.Ct. 74, 46 L. Ed. 147, the debtor had given an irrevocable power of attorney to the creditor to confess judgment many years before. Judgment was confessed under it within the four months, and the Supreme Court held it to be a voidable preference. In Re Sheridan (D. C.) 98 Fed. 406, in Re Ronk (D. C.) 111 Fed. 154, and in Re Dismal Swamp Co. (D. C.) 135 Fed. 415, 417, 418, mort-

gages executed within the four months in performance of agreements to give them made more than four months before the filing of the petitions in bankruptcy were held to be voidable preferences, and this view seems to be sustained by the terms of the bankruptcy act, by the more cogent reasons, and by the weight of authority."

The defendants will be decreed to assign and convey to the complainant any and all of the property and assets of the Lumber Company, assigned or conveyed to them, or either of them, and remaining in their hands, or in the hands of either of them in specie, and to account for the proceeds of such property and assets as have been converted by them, or either of them, into cash or otherwise disposed of.

A decree of that general character will be entered upon notice to counsel.