## ARTHUR v. HARRINGTON et al.

(District Court, N. D. New York. February 27, 1914.)

1. BANKRUPTCY (§ 166*)—NOTICE TO OFFICER—ADVERSE INTEREST.

Where a bankrupt was treasurer of a corporation, the fact that he knew himself to be insolvent at the time he made a payment on certain indebtedness to the corporation did not charge it with knowledge of such fact.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 250–253, 255–258; Dec. Dig. § 166.*]

2. CORPORATIONS (§ 428*)—KNOWLEDGE OF OFFICERS—NOTICE.

Where the treasurer of a corporation informed its president of his insolvent condition prior to making an alleged preferential payment on his indebtedness to the corporation, the knowledge of the president was imputable to the corporation.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1748–1761; Dec. Dig. § 428.*]

3. BANKRUPTCY (§ 166*)—PREFERENCES—KNOWLEDGE OF INSOLVENCY.

Where a debtor of a corporation was insolvent at the time he made an alleged preferential payment to it, it was not necessary that the corporation's president should have actual knowledge of the debtor's insolvent condition in order that the payment should be recoverable as a preference, but it was enough if he had reasonable cause to believe that such was the fact.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 250–253, 255–258; Dec. Dig. § 166.*]

4. BANKRUPTCY (§ 166*)—PREFERENCES—NOTICE OF INSOLVENCY.

Mere nonpayment of a debt on demand, or circumstances which create a mere suspicion or fear that the debtor may be insolvent, are insufficient to charge the creditor with notice of his insolvency so as to render a pay-

*For other cases see same topic & § NUMBER in Dec & Am. Digs. 1907 to date, & Rep'r Indexes

ment on the debt prior to the debtor's bankruptcy recoverable as a preference.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 250–253, 255–258; Dec. Dig. § 166.*]

5. BANKRUPTCY (§ 164*)—PREFERENCES—NOTICE OF INSOLVENCY.

A bankrupt, who was treasurer of a corporation, had been indebted to it for a considerable time to the amount of $384. Repeated demands had been made on him for payment, and he informed the corporation's president that he was in financial difficulties. The corporation had never before declared more than 10 per cent. dividends, but after the treasurer's bankruptcy schedules were prepared—but before they were filed—a meeting of the directors was held at which a dividend of 20 per cent. was voted, with the understanding that the treasurer's dividend be credited on his account owing to the corporation. It was necessary that this be done in order to enable the corporation to pay the dividend, and immediately after the treasurer's check was executed it was indorsed by him and deposited to the corporation's credit in partial payment of the treasurer's debt. Held, sufficient to charge the corporation with knowledge that the payment would constitute a preference so as to render the same recoverable by the bankrupt's trustee.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 267; Dec. Dig. § 164.*]

In Bankruptcy. Action by William M. Arthur, as trustee in bankruptcy of Walter C. Harrington, against Walter C. Harrington and the Rome Cement Stone Company to recover a preference. Judgment for plaintiff.

G. Linnemann Prescott, of Rome, N. Y., for plaintiff.
Stevens & Evans, of Rome, N. Y., for defendants.

RAY, District Judge. On the 21st day of December, 1911, Walter C. Harrington subscribed and swore to his petition and schedules in bankruptcy, and same were presented and filed in court on the 22d day of December, 1911. These, with other evidence in the case, show that he was then insolvent and had been for some time, and that he well knew this fact. On the 8th day of December, 1911, said Harrington was indebted to the Rome Cement Stone Company in the sum of $384. He was the secretary and treasurer of said company until January 22, 1912, and was one of its incorporators and its first president. H. C. Pendorf was the president of the defendant company, and a director and stockholder therein, as was also said Harrington. Pendorf and Harrington did substantially all the business for the company.

December 8, 1911, at a meeting of the board of directors of the company, a dividend of 20 per cent. was voted payable December 20, 1911, *it also being understood that W. C. Harrington's dividend be credited on his account owing the company,* some $384. This appears in the minutes of the meeting at which directors Smith, White, Bailey, Pendorf, and Harrington were present. The dividend was declared and paid, and the amount of Harrington's dividend was $352. It was paid by a check for $352, signed "W. C. Harrington, Treasurer of The Rome Cement Stone Company" and countersigned by "H. C. Pendorf, President," dated December 21, 1911, and payable to the order of W. C. Harrington. Harrington indorsed the check the same

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

day, very soon after it was signed, and turned it over to Pendorf, who deposited it to the credit of said Rome Cement Stone Company as a payment on Harrington's indebtedness to the company. Harrington was not only the secretary and treasurer of the company, but he kept books, and with Pendorf was largely its manager. This indebtedness of Harrington's had existed since October 1, 1910, and he had frequently been called on to pay, but had not. Harrington had pledged some of his stock for loans, and this was known to one or more of the directors. This was well known to the company. Pendorf, the president, and Harrington, the secretary and treasurer, were friendly, occupied the same office, and were much together in managing the affairs of this company.

Harrington well knew that he was insolvent when the arrangement for a dividend and its payment was made, and that it would work a preference, and there is no doubt that he intended to prefer, and knew that he was preferring, the company of which he was treasurer over his other creditors.

It is contended, however, by the defendant Rome Cement Stone Company that neither it nor its agent acting therein had reasonable cause to believe that the receipt and retention of this transfer of property represented by this check for this dividend would effect a preference, that is, enable the Rome Cement Stone Company to obtain a greater percentage of its debt than any other of the creditors of Harrington of the same class. Pendorf, the president, was sworn as a witness, and asked:

"Q. Do you recall any reason now why at that meeting on December 8th it should have been resolved that this money [referring to the dividend of Harrington] should be turned in on his account? * * * A. If I remember rightly, Mr. Prescott, because of the fact that Mr. Harrington and I had various talks about he paying something on his account long time before, during the summer, for instance, and early spring, I am very sure that that is the reason. I had asked him different times if he didn't think it would be advisable for him to square with the company during the summer and the spring and running into the fall; the account was getting an old one, and we were needing the money; our company was not a large one, and the funds were low."

This must have indicated to the president of the defendant company that Harrington was in want of ready money. The examination of Harrington discloses that he came to Rome about five years ago, with not over $300 to $500. He became a stockholder and an officer in the Rome Brick Company, but his evidence discloses that he was owing considerable sums, using his stock as collateral, and that such property as he had was mortgaged. The various directors of the Rome Cement Company deny that they had any knowledge of Harrington's insolvency, or knowledge of facts indicating such insolvency or serious financial trouble. Mr. Bailey, another director, says it was known that Harrington had been slow pay a good while. Mr. Smith, another director, says, in substance, that Mr. Harrington was the largest debtor to the company; that they often talked to him about the account and about his making a payment on it, and that he, Smith, suggested his turning in some of his stock in the company to pay it, and Harrington said he

did not know as that would be legal, and this led up to the suggestion by Smith that Harrington turn in his dividend. This was about double the size of any former dividend, and to make it Harrington's payment by means of his dividend was included as cash on hand, and in this way the large dividend was made possible. Mr. White, another director, says that the evening the resolution was passed it was talked of as "a way out of getting payment on Mr. Harrington's bill that was way past due, and had been trying to get for a long time." Also that he knew nothing of Harrington's financial standing; that he knew the account was of long standing, long owing the company, and that "the directors talked it over (the arrangement to make the dividend and turn Harrington's on his indebtedness) as a way to get it out of him." Also that the dividends before that had not been more than 10 per cent. Harrington himself testifies that he and Pendorf had talked of this indebtedness many times prior to December 8, and:

"Q. At any time previous to December 8, 1911, had you told Mr. Pendorf that you were in financial difficulty? A. I had."

He then says he so told Pendorf a month or more prior to December 8th.

"Q. Can you detail any of the conversation now? A. I don't recollect just how I broke the ice to him. I remember his making a remark, 'That is too bad.', I don't remember just exactly what I said."

This was some three weeks prior to the time Smith suggested the dividend and turning it on the debt. And again, when examined on behalf of the defendant company and his attention was called to certain statements made by Pendorf, Harrington said:

"I am not questioning that end of it; I am just making the assertion that Mr. Pendorf knew I was insolvent. Q. Prior to December 8, 1911? A. Prior to December 8th."

[1] The knowledge of Harrington himself that he was insolvent December 8th and from that time on, and that, turning the dividend in the way that it was done operated as a preference, was not the knowledge of the defendant company, and it cannot be imputed to such company, although Harrington was at the time its secretary and treasurer. Casco National Bank v. Clark, 139 N. Y. 307, 34 N. E. 908, 36 Am. St. Rep. 705; Merchants' National Bank v. Clark, 139 N. Y. 314, 34 N. E. 910, 36 Am. St. Rep. 710.

[2] But information conveyed by Harrington to Pendorf, the president of the company, that Harrington was in financial difficulties and insolvent was information to the company, and the knowledge of Pendorf may be imputed to the company. Collett v. Bronx, etc., 30 Am. Bankr. Rep. 598, 205 Fed. 370, 123 C. C. A. 392. Pendorf, as president of the company, represented it, and he had been informed by Harrington some weeks prior to December 8th that he, Harrington, was in financial difficulties and could not pay. It was after Harrington had thus informed the president of the company that Smith, a director, arranged for this large dividend of 20 per cent., twice the amount of any former dividend, and that Harrington should immediately pay it over to the company as a payment on his indebtedness to

the company and it was talked up and agreed upon and voted by the board of directors in Pendorf's presence, and on the 21st he signed the check and took it back and deposited it to the credit of the company as a payment by Harrington almost immediately. It may be that all the directors did not know of Harrington's financial trouble, but it is quite evident that Smith and Pendorf did. It was a transaction quite out of the ordinary, and such a proposition would excite some comment and curiosity. The transaction at the meeting of the board of directors December 8th corroborates Harrington in his statement that he had before that informed the president of his insolvency, and demands the inference that the board of directors, or some of them, had also been informed. ·

Harrington's petition and schedules were ready for filing when the checks in payment of the dividend were made out and signed, and when Harrington handed his check over to Pendorf, the president, who received it for the company and deposited it to his credit. But one conclusion is reasonable under this evidence, and that is that Pendorf, acting in the line of his duty as president and for the company, received the check of $352 from Harrington with knowledge of his financial difficulties and`insolvency, and hence with reasonable cause to believe that the taking and use by the company of such check would effect and operate as a preference. The proof as to the assets and liabilities of Harrington showed that this payment, made on the eve of filing the petition, gives this defendant company a much greater percentage of its claim than the other creditors of the bankrupt will receive.

[3] It was not necessary that the president of the defendant actually *know* that Harrington was insolvent, or actually *know* that the taking and retention of the check would effect or work a preference. There was enough to establish reasonable cause to believe, and this is what the statute requires. The president having the information he did, enough to place a man of intelligence on inquiry, the defendant is chargeable with all the knowledge due inquiry would have disclosed. Stern v. Paper (D. C.) 25 Am. Bankr. Rep. 451, 183 Fed. 228; Tilt v. Citizens' Trust Co. (D. C.) 27 Am. Bankr. Rep. 320, 191 Fed. 441; Coder v. McPherson, 18 Am. Bankr. Rep. 523, 152 Fed. 951, 82 C. C. A. 99; Pittsburgh Plate Glass Co. v. Edwards, 17 Am. Bankr. Rep. 447, 148 Fed. 377, 78 C. C. A. 191; Forbes v. Howe, 102 Mass. 427, 3 Am. Rep. 475; Whitwell v. Wright, 136 App. Div. 246, 120 N. Y. Supp. 1065, 23 Am. Bankr. Rep. 747; Coleman v. Decatur Egg Case Co., 26 Am. Bankr. Rep. 248, 186 Fed. 136, 108 C. C. A. 248.

[4] Mere nonpayment of the debt on demand, or circumstances which create a mere suspicion or fear, are not enough. First National Bank of Philadelphia v. Abbott, 21 Am. Bankr. Rep. 436, 165 Fed. 853, 91 C. C. A. 538; Sparks v. Marsh et al. (D. C.) 24 Am. Bankr. Rep. 280, 177 Fed. 739; Powell v. Gate City Bank, 24 Am. Bankr. Rep. 316, 178 Fed. 609, 102 C. C. A. 55.

[5] The action taken by the board of directors on the eve of the filing of the petition in bankruptcy, and the receipt and retention of the check by the president immediately on its being made out and

signed, and at a time when the bankrupt, the secretary and treasurer of the company had his petition and schedules in bankruptcy all made out and ready for filing, with the information given by Harrington to Pendorf, the president, all together requires a finding in this case that Walter C. Harrington, the bankrupt, on the 21st day of December, 1911, transferred to his creditor the Rome Cement Stone Company, this defendant, in part payment of his indebtedness to that company, $352 of his property; that such transfer was made the day before Harrington filed his petition and schedules in voluntary bankruptcy and after they were executed; that the receipt and retention of such transfer of property by the Rome Cement Stone Company operated, and will operate, to enable the said company, one of the creditors of the bankrupt, to obtain a greater percentage of its debt than any other of such creditors of the same class; that at the time of such transfer said Walter C. Harrington was insolvent and unable to pay his debts in full, and well knew the fact; that the president of said company, who received the transfer of property from Harrington pursuant to a prior understanding with its board of directors, knew at the time that Harrington was insolvent and unable to pay his debts, and had reasonable cause to believe that the receipt and retention or enforcement of such transfer would effect and operate as a preference, that is, enable said company to obtain a greater percentage on its debt than any other of Harrington's creditors of the same class.

There will be a decree, or judgment, for the recovery of such preference, viz., $352, with interest thereon from the 21st day of December, 1911, with costs.